PISTORINO & COMPANY, INC. *vs.* STYLE LEATHER CO., INC.

Suffolk.    February 8, 1972.— March 23, 1972.

Present: CUTTER, SPIEGEL, REARDON, QUIRICO, & HENNESSEY, JJ.

*Broker,* Customhouse brokers.    *Importer.    Customs.    Equity Jurisdiction,* Declaratory relief.

In a suit where the plaintiff, a licensed customhouse broker, sought declaratory relief concerning its right to reimbursement from the defendant, a leather importer, for additional import duties owed on the defendant's account, the trial judge correctly overruled a demurrer by the defendant where there was clearly an existing controversy about the defendant's obligation so to reimburse the plaintiff; it did not matter that the additional duty in question was not liquidated by plaintiff until after the commencement of the suit; and the plaintiff was not obliged to postpone its request for declaratory relief until termination of administrative and review proceedings to protest the additional duty before the customs authorities and the United States Customs Court [468]; moreover, the plaintiff's request for declaratory relief did not involve the correctness of the Federal duty imposed or issues about which further administrative relief was available, nor did it raise any question of invading the exclusive jurisdiction of the United States Customs Court or of the Court of Customs and Patent Appeals [468].

Although a customhouse broker had an obligation to use due diligence and good faith in its dealings with an importer, failure by the broker to advise the importer about the availability of a procedure whereby the importer could obtain from the customs service a binding determination as to the applicable import duty did not constitute a lack of due diligence and good faith on the broker's part where the importer had already purchased the goods, they had already arrived in this country, and there was no indication of any uncertainty on the part of either the importer or the customs service which might have led the broker to consider advising the importer to request a binding determination of the import duty. [469–472]

BILL IN EQUITY filed in the Superior Court on May 6, 1969.

The case was heard by *Kalus, J.*

*George Karelitz* for the defendant.

*Phillip R. Shea* for the plaintiff.

CUTTER, J.    The plaintiff (Pistorino), a licensed cus-

tomhouse broker in Bostòn, seeks declaratory relief concerning its right to reimbursement by the defendant (Style), a leather importer in Haverhill, for about $35,000 of additional import duties owed on Style's account (and liquidated by Pistorino after the initiation of this suit) on goods brought into the United States by Style.[1]  A Superior Court judge overruled Style's demurrer and, after hearing, caused a final decree to be entered, declaring that Style must pay to Pistorino $35,169.86 with interest.  Style appealed.  The facts are stated largely on the basis of the judge's voluntary findings.  The evidence is reported.

Louis Shafmaster was treasurer of Style and "in operational control" of that company.  Prior to July 8, 1968, he purchased in West Germany three sample rolls of a synthetic fabric (loosely referred to as imitation leather) for use for lining shoes.  These were exported to the United States.  T. D. Downing Company was employed as customhouse broker.  The duty stated on the "Informal Entry" papers [2] was nine per cent.

On July 26, 1968, Shafmaster bought for Style a bulk

---

[1] As to the right to reimbursement in such cases, see *William G. Young & Co. Inc.* v. *Dyer,* 112 F. Supp. 1, 4 (S.D. N.Y.).  See also *St. Paul Fire & Marine Ins. Co.* v. *United States,* 370 F. 2d 870, 873 (5th Cir.).

[2] The Bureau of Customs "Informal Entry" form carried a note in small print, "The rates of duty used in this entry are not binding for future imports.  Section 16.10(a), Customs Regulations, tells how to obtain binding rates."  This section reads: "§ 16.10a Tariff classification of prospective imports.  (a) Any prospective importer or foreign exporter may apply in writing to the Commissioner of Customs, Washington, D. C. 20226, for a ruling as to the tariff classification of any article which he intends to import into or ship to the United States in commercial quantities.  The application shall contain a full description of each article.  The application shall also give the following information . . . (1) The respective quantities and values of the component materials of . . . the article . . .; (2) information as to its chief use . . . in the United States; and (3) any specifications, analyses, or other information deemed necessary to a tariff classification . . ..  Whenever practicable, a sample . . . should be submitted . . .."  The remaining paragraphs (b), (c), and (d) of § 16.10a indicate that the process is likely to result in detailed (and perhaps prolonged) administrative consideration.  There was evidence that it might take from one week to four months to obtain a binding declaration although, in this particular case, since no binding declaration was sought, Pistorino's executve vice-president of course could not tell what time in fact would have been required.  The

quantity of the same merchandise for an invoice cost of $58,169.94. This material arrived in New York about August 17. On August 19, Style sent the shipping documents to Pistorino. A sample of the material was sent by Pistorino to the Boston Customs House by messenger with a note requesting that the rate of duty be determined. A handwritten reply was received (initialed by a Customs import specialist, Albert Van Bibber) referring to tariff schedule § 355.81 and a rate of eleven per cent.

On August 27, Pistorino sent to Style an invoice covering "estimated duty only" containing two items: a duty deposit of $6,398.59 for "2587 rolls [of] leather" and "Oceanfreight $2208.75," representing a "cash outlay" by Pistorino. On August 29 or 30, Pistorino made entry of the goods and was reimbursed by Style for the duty. On August 31, Pistorino sent a final invoice to Style, in which, next to the item "Duty," appeared in red print, "(Subject to correction by customs)."

On January 21, 1969, the Boston District Director of Customs notified Pistorino and Style of an increase in duty of about $35,000 because of a reclassification from tariff schedule § 355.81 at eleven per cent to § 359.50 at twenty-five cents a pound plus thirty per cent ad valorem. On May 9, 1969, the additional duty was liquidated by customs at $35,169.96. Pistorino had notified Style of its right to "protest" the increase. Style failed to file any protest or to avail itself of Pistorino's offer to be of assistance.

Frederick Koerner, Pistorino's executive vice-president, testified that Pistorino obtains a binding declaration "in case a client wants to determine how much the duty . . . [will] be on merchandise which he intends to buy and import." This, he said, would be done "in case

record gives no adequate indication to what extent the procedure for obtaining a "binding determination" may be comparable in difficulty to obtaining a "closing agreement" in any Federal internal revenue tax matter. See Int. Rev. Code of 1954, § 7121; Rabkin & Johnson, Federal Income, Gift, and Estate Taxation, § 71.04; C.C.H. Standard Federal Tax Reporter (1972), pars. 5692–5693.

the merchandise has not arrived yet" by sending "a sample to Washington and ask[ing] for a decision . . . prior to buying the merchandise." He also testified that Pistorino first "received the documents" from Style on August 20, 1968, which was the first word Pistorino had of this transaction. No binding declaration was sought, he said (in an answer to an interrogatory) because there "was not sufficient time to obtain . . . [one] and . . . [Style] did not request one."[3]

The trial judge made also the following findings and reached the conclusions mentioned below. The merchandise was bought on July 26, 1968, and shipped about August 6. Style first communicated with Pistorino on August 19. Shafmaster and Koerner had no conversations before January 22, 1969. If Style "relied on anyone before it made the . . . purchase on July 26 . . . it relied on the duty stated on the papers when it employed T. D. Downing Company as its customs broker" in connection with entry of the samples. Pistorino "acted with due diligence and reasonableness as a customs broker in full conformity with applicable" customs regulations. "Shafmaster was a man of considerable experience as an importer of leather and allied products." From this the judge concluded that he was "familiar with the opportunity available to an importer to obtain . . . a binding determination of duty."

The judge ruled that Pistorino, on the facts found, had no duty (as Koerner in fact testified, in effect as an expert on customs practice) to advise Style about the binding determination procedure. He also ruled that Pistorino was entitled to be exonerated for the additional customs duty ($35,169.86) for which it became liable (see fn. 1, *supra*).

---

[3] Pistorino's employee, Udo D. Lampert, an import specialist, obtained the Boston customs officer's opinion that the sample merchandise was subject to duty at eleven per cent under § 355.81. He testified that he was not familiar with the "binding determination" procedure. He, however, was not a licensed customhouse broker and merely handled "import documentations, to get them ready for Customs."

1. The demurrer was correctly overruled. There was clearly a controversy about Style's obligation to reimburse Pistorino for the additional duty. Pistorino, as the customhouse broker and importer of record, became liable for the additional duty in the first instance. It is immaterial that the duty was not liquidated by the customs authorities until May 9, 1969, after this suit was commenced (on May 6, 1969). General Laws c. 231A has long been construed broadly as to the existence of a controversy. See *School Comm. of Cambridge* v. *Superintendent of Schs. of Cambridge*, 320 Mass. 516, 518; *Billings* v. *Fowler, ante*, 230, 233–234. See also *Nissenberg* v. *Felleman*, 339 Mass. 717, 720–722.

Pistorino was not obliged to postpone its request for declaratory relief until termination of administrative and review proceedings before the customs authorities and the United States Customs Court to protest the increased duty. Style refused or failed to initiate such proceedings. It also did not request Pistorino to initiate a protest in its behalf. See 19 C. F. R. (1968) § 31.10 (d) forbidding a customhouse broker to represent any person in an appeal or protest "unless he shall previously have been . . . authorized to do so." See also *Altieri* v. *United States*, 55 C. C. P. A. 104, 106.

The present proceeding does not involve the correctness of the customs duty in fact imposed and thus there is no question of invasion of any exclusive jurisdiction of the United States Customs Court or of the Court of Customs and Patent Appeals. See 28 U. S. C. §§ 1541, 1582, 1583 (1970). Cf. *Batista* v. *Nicolls*, 213 F. 2d 20, 21–22 (1st Cir.), where declaratory relief was prematurely sought concerning the precise subject matter about which further administrative relief was available. The jurisdiction of this court and of the Superior Court to afford declaratory relief is not affected by the circumstance that it may be necessary incidentally to consider questions affecting the duties of customhouse brokers under the Federal customs laws. See *Union Brokerage Co.* v. *Jensen*, 322 U. S. 202, 204–206; *F. W. Myers & Co.* v. *Piche*, 109 N. H. 357, 359.

2. The judge's subsidiary findings are justified by the reported evidence, much of it oral, including the testimony of Shafmaster and Koerner. The findings cannot be said to be plainly wrong. See *Hurley* v. *Hobbs*, 360 Mass. 618, 621–622.

The finding, most dependent on inference, is that Shafmaster was "familiar with the opportunity available to an importer to obtain . . . a binding determination of duty." This was supported by evidence that Shafmaster had been dealing with the German shipper of the merchandise for eighteen to twenty years, that he had been engaged in importing leather and spent much time in Europe on the importing business; that the samples were imported through T. D. Downing Company "for the purpose of determining the customs duty that would be employed in merchandise of this type in the future"; and that he had seen the United States Customs "informal" entry form, used by T. D. Downing Company, at least as early as a pre-trial deposition taken eight months before trial in October, 1970. This "informal" entry form (see fn. 2, *supra*) contained a reference to the "binding determination" procedure. The judge was not required to believe, and obviously did not believe, Shafmaster's denial of knowledge of the opportunity of obtaining a binding declaration. Although we think this inferential finding permissible we deal with the case without relying on it.

3. On the merits, Style's principal contention is that Pistorino "had a duty to advise . . . [Style] of the availability of a procedure for obtaining a binding determination of duty from the . . . Bureau of Customs." Style, however, points to no regulation specifically imposing such a duty. There was general evidence about the duties and function of a licensed customhouse broker. See 19 C. F. R. (1968) §§ 31.1–31.14.[4] The obligations im-

---

[4] Concerning the duties of customhouse brokers, see *Union Brokerage Co.* v. *Jensen*, 322 U. S. 202, 203–204, stating that "the consignee of imported merchandise must 'make entry' of them at the office of the collector of customs at . . . [the entry point] either in person or by

posed on brokers by the regulations [5] do not appear to be more onerous than the duty to use due diligence and good faith. [6]

Wholly apart from the judge's finding (discussed in part 2 of this opinion) that Shafmaster knew about the "binding determination" procedure, the judge was not required by the evidence to conclude that there was any lack of due diligence or good faith in Pistorino's failure to advise Shafmaster about the procedure. The evidence does not suggest that Style informed Pistorino of any special uncertainty concerning the merchandise or its composition. Pistorino also is not shown to have had

an authorized agent, and this must be done within forty-eight hours of the report of the vehicle which carried the goods unless the collector extends the time. . . . To make entry, the contents and value of the shipment must be declared and the tariff estimated, and the production of a certified invoice and a bill of lading is generally required. . . . Speed in making entry is vital, because goods cannot proceed to their ultimate destination until its completion. Apart from the fact that importers cannot always or even often make entries in person, the procedure makes demands upon skill and experience. The specialist . . . is the customhouse broker. In addition, he advances the duty in order that the goods may be cleared. . . . The competence of the broker also bears on the efficient collection of customs duties in that the likelihood of additional assessment or refund after final determination of the duty is greatly lessened by accuracy in the tentative computation. But since errors and differences of opinion are inevitable, to insure collection of deficiencies the Government requires a bond prior to release." The opinion proceeds (pp. 204–205) to discuss, generally the nature of the licensing process, designed to assure (p. 204) "a sense of responsibility and skill" on the part of such brokers.

[5] Section 31.10 defines certain general obligations of such brokers as, for example, "(j) Each customhouse broker shall exercise due diligence to ascertain the correctness of any information which he imparts to a client with reference to any customs business; and no customhouse broker shall knowingly impart to a client false information relative to any such business when such false information is or might be detrimental to the interests of the Government, the client, or any other person. (k) No customhouse broker shall withhold information relative to any customs business from a client who is entitled to the information."

[6] Style argues that a customhouse broker stands in a fiduciary relationship to an importer served by him. Cf. *Berenson* v. *Nirenstein,* 326 Mass. 285, 288. Even if we were to assume (without deciding) that Pistorino was a fiduciary, this record requires no finding that Pistorino has committed any breach of fiduciary duty. The evidence justifies a conclusion that Pistorino has complied with proper standards of business morality and good faith and has exercised that due diligence and skill in the circumstances which would be employed by a man of ordinary prudence in dealing with his own affairs. Cf. Restatement 2d: Trusts, §§ 170, 174.

knowledge of the earlier sample shipment (which carried a nine per cent rate rather than the eleven per cent rate originally estimated on the bulk shipment).

Such uncertainty as Pistorino may have had was confined to the fact that it was "unable to determine the nature of the material from the documents." In these circumstances, Pistorino acted with reasonable diligence in obtaining a sample from Style and in submitting it to the Boston customs office for its classification.

Pistorino thus had in August, 1968, no indication of any uncertainty on the part of either Style or the customs service which might have led to some consideration of using the "binding determination." Indeed, the basis of the final assessment in 1969 seems to have been a post-entry test of the merchandise by the United States Customs Laboratory, and a "determination that the . . . merchandise was a textile fabric of man-made fibers, not specifically provided for under any other tariff provision" than that (§ 359.50) used in the final assessment. The judge reasonably could have decided that Pistorino was not bound to anticipate such a nonapparent and latent difficulty.

The judge was justified in placing reliance on Koerner's testimony about the occasions when a "binding determination" would ordinarily be requested. He could also reasonably conclude (a) that such a determination would not be usual where merchandise had already arrived in the United States following a purchase, (b) that such a procedure (fn. 2) was not generally employed except where some special circumstance suggested its use,[7]

---

[7] The record was somewhat meager with respect to highly complicated Federal customs procedures and the usual practices of customhouse brokers in situations like that here presented. Style's counsel at trial sought to establish that a binding determination could have been obtained while the merchandise remained under customs bond, subject to shipment elsewhere and resale without paying the customs duty. The evidence adduced on this subject was at best inconclusive, and did not require the judge to decide that, in the circumstances, the additional customs liability could have been avoided. There was no evidence that even the avoidance of the duty would have decreased loss to Style, in view of its possible loss in resale and reshipment of the goods.

and (c) that any reliance by Style or Shafmaster was on the T. D. Downing Company "informal" entry rather than on anything Pistorino did or reported or failed to report.

*Decree affirmed with costs of appeal.*